**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JERMAINE JONES, | : | CIVIL ACTION NO. |
| Petitioner, | : | 3:10-CV-49 (JCH) |
| | : | |
| v. | : | |
| | : | |
| PETER MURPHY, Warden, | : | SEPTEMBER 20, 2010 |
| Respondent. | : | |

**RULING RE: PETITION FOR WRIT OF HABEAS CORPUS (Doc. No. 3)**

## I.      INTRODUCTION

Petitioner Jermaine Jones ("Jones"), an inmate confined at the MacDougall-

Walker Correctional Center in Suffield, Connecticut, brings this action pro se for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges his conviction for

murder and criminal possession of a firearm on the grounds that his conviction violated

his Sixth and Fourteenth Amendment rights.  For the reasons that follow, the petition is

denied.

## II.      FACTUAL BACKGROUND

The Connecticut Supreme Court determined that the following facts were

adduced at trial.  On the afternoon of June 22, 2001, Jones and his girlfriend, Erica

Minnifield ("Minnifield"), traveled from their residence in Hartford to Waterbury to visit

friends and family.  Minnifield went to her mother's house and then to a shopping mall

with Thomas Williams ("Williams"), where she purchased several new outfits.  Jones,

who had not been with Minnifield after they arrived in Waterbury, saw her outside a

local bar that evening wearing a new outfit.  Jones suspected that another man had

purchased the clothes for Minnifield and confronted her with his suspicions.  An

argument followed.  State v. Jones, 281 Conn. 613, 616 (2007).

Later that evening, a friend, Theo Byrd ("Byrd"), gave Jones and Minnifield a ride back to Hartford. Jones was sitting in the front passenger seat and Minnifield was in the back. Jones again confronted Minnifield about the new clothes. The argument became violent. Jones reached into the back seat and began to hit Minnifield and also cut her arm with a knife he was holding. When they arrived in Hartford, Minnifield ran and hid in a neighbor's yard. Jones found her and dragged her into their house. Jones then began cutting Minnifield's pants from her body, using the same knife he had cut her with earlier. The following morning, while Jones was asleep, Minnifield left the house and returned to her mother's home in Waterbury. Id. at 616-17.

That evening, Jones was driving around Waterbury with another friend. When he saw Minnifield and Williams drive by in Williams' car, he became angry and jealous. Later that evening, Jones again saw Minnifield riding with Williams. Id. at 617.

That night, Jones was riding with Byrd in Byrd's car. As they drove around Waterbury, they saw Williams' car parked on the street. Byrd stopped the car and Jones got out of the vehicle, cocking the hammer of a .45 caliber semi-automatic handgun he had concealed in his pocket. Williams, who was approaching his car, greeted Jones. When Jones asked Williams to stop seeing "his girl," Williams laughed and asked what Jones meant. Jones said that he was serious and would kill Williams the next time he saw him with Minnifield. When Jones removed the handgun from his pocket, Williams became scared and put his car in reverse. Jones aimed the gun at Williams and shot him four times. Id.

III.     PROCEDURAL BACKGROUND

Jones was charged with one count of murder and one count of criminal

possession of a firearm.  On Jones' motion, the murder charge was tried to a jury and the possession of a firearm charge was tried to the judge.  The parties agreed that the two trials would proceed simultaneously, with the state supplementing the record for the bench trial at the conclusion of the jury trial.  Id. at 615 & n.1.

Jones repeatedly complained that his initial attorney, Chief Public Defender Alan McWhirter ("McWhirter"), was not doing his job and failed to contact Jones.  During the pretrial proceedings, Jones filed several pro se motions.  Although he was represented by counsel, Jones argued with the court over points of law and regularly tried to reargue issues on which the court previously had ruled.  At one hearing, he became angered by the state's plea offer and needed to be restrained.  When Jones filed a grievance against Attorney McWhirter, the trial court allowed Jones to dismiss McWhirter and appointed special public defender Lawrence Hopkins ("Hopkins").  Id. at 619-623.

Following voir dire, the trial court held a hearing on Jones' motion to suppress his confession and the murder weapon.  The trial court denied the motion to suppress.  Subsequent to the court's oral ruling, Jones challenged the court's findings of fact and conclusions of law.  After some discussion, the court told Jones that the ruling was made and no further argument would be entertained.  Jones persisted in arguing with the court.  During the trip back to the correctional facility, Jones was so upset by the ruling that he put his fist through a plexiglass window and broke his hand.  Id. at 623-24.

On the second day of trial, Jones informed the court that he was so upset by a ruling issued the previous day that he wanted nothing further to do with the trial.  When questioned by the court, Jones stated that he knew what he was doing and wanted to absent himself from the proceeding.  Jones told the court that he understood that the

trial would continue and he might be prejudiced because the jury would note his absence. Jones also stated that he intended to dismiss his attorney and represent himself. The court denied the request and ordered the marshals to remove Jones from the courtroom. Approximately eight to ten marshal were required to forcibly remove Jones from the courtroom. Id. at 625-30.

Although offered the opportunity to come to court and watch the proceedings from a holding cell adjoining the courtroom, Jones declined. He did not reenter the courtroom until sentencing. The trial court found that Jones had waived his right to be present through his violent and disruptive behavior. Id. at 633-36.

Jones was convicted on both charges and sentenced to a total effective term of imprisonment of sixty-five years. On direct appeal, Jones challenged his conviction on three grounds. He claimed that the trial court improperly (1) removed him from the courtroom during the trial, (2) denied his request to represent himself, and (3) denied his motion to suppress his confession. The Connecticut Supreme Court affirmed the conviction. Id. at 616. Jones filed a petition for writ of certiorari to the United States Supreme Court. The petition was denied. Jones v. Connecticut, 552 U.S. 868 (2007).

In October 2004, Jones filed a petition for writ of habeas corpus in state court. His amended petition claimed that Hopkins provided ineffective assistance by failing to preserve Jones' right to be present at trial and failing to protect his right to testify. Following an evidentiary hearing, the court denied the petition. Jones v. Comm'r of Corr., No. CV044001435, 2007 WL 1976664 (Conn. Super. Ct. June 15, 2007). Although the trial court denied Jones' petition for certification to appeal, Jones appealed the denial to the Connecticut Appellate Court. The appeal was denied in a per curiam

decision, and the Connecticut Supreme Court denied certification to appeal. <u>Jones v.</u> <u>Comm'r of Corr.</u>, 115 Conn. App. 902, <u>cert. denied</u>, 293 Conn. 911 (2009).

## IV. STANDARD OF REVIEW

The federal court will entertain a petition for writ of habeas corpus challenging a state court conviction only if the petitioner claims that his custody violates the U.S. Constitution or federal laws. 28 U.S.C. § 2254(a). A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court. <u>Estelle v.</u> <u>McGuire</u>, 502 U.S. 62, 68 (1991).

The federal court cannot grant a petition for a writ of habeas corpus filed by a person in state custody with regard to any claim that was rejected on the merits by the state court unless the adjudication of the claim in state court either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The federal law defined by the Supreme Court "may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." <u>Kennaugh v. Miller</u>, 289 F.3d 36, 42 (2d Cir. 2002). Clearly established federal law is found in holdings, not dicta, of the Supreme Court at the time of the state court decision. <u>Carey v. Musladin</u>, 549 U.S. 70, 74 (2006).

A decision is "contrary to" clearly established federal law where the state court applies a rule different from that set forth by the Supreme Court or if it decides a case

differently than the Supreme Court on essentially the same facts. <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002). A state court unreasonably applies Supreme Court law when the court has correctly identified the governing law, but unreasonably applies that law to the facts of the case. The state court decision must be more than incorrect; it also must be objectively unreasonable, "a substantially higher threshold." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007).

When reviewing a habeas petition, the federal court presumes that the factual determinations of the state court are correct. The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); <u>see</u> <u>Boyette v. Lefevre</u>, 246 F.3d 76, 88-89 (2d Cir. 2001) (noting that deference or presumption of correctness is afforded state court findings where state court has adjudicated constitutional claims on the merits). Because collateral review of a conviction applies a different standard than the direct appeal, an error that may have supported reversal on direct appeal will not necessarily be sufficient to grant a habeas petition. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 634 (1993).

## V.     DISCUSSION

Jones challenges his conviction on the three grounds he raised on direct appeal: (1) his conviction was obtained by using a coerced confession in violation of his Fifth, Sixth, and Fourteenth Amendment rights; (2) he was denied his right to be present at all critical stages of his prosecution in violation of his rights under the Confrontation Clause and the Sixth and Fourteenth Amendments; and (3) he was denied the right to self-representation in violation of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.

A.    Confession

Jones first contends that his confession was obtained in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments because he was not advised of his rights before he gave the statement and he did not knowingly and voluntarily waive those rights. He argues that the gun was the product of the unlawful confession. Specifically, Jones contends that he was under the influence of drugs and alcohol while he was being questioned, that the detective improperly used religion as a tool to pry admissions from him, that he never read the statement, and that he signed the statement only because he was told that it contained information favorable to him.

The Connecticut Supreme Court determined that the following facts were relevant to this claim. Detective Scott Stevenson ("Stevenson") from the Waterbury Police Department testified at the suppression hearing along with Jones.

Stevenson testified that, on June 27, 2001, he accompanied several Waterbury police officers to Hartford to execute an arrest warrant for Jones on a charge of assault and a search warrant for Jones' home. They arrived between 9:00 a.m. and 10:00 a.m., placed Jones under arrest and began to execute the search warrant. After the search was concluded, they returned to Waterbury with Jones. When they arrived at the Waterbury Police Department, between 12:00 p.m. and 1:00 p.m., Jones was placed in an interview room. Stevenson was instructed to remain in the room with Jones to prevent him from leaving because the room could not be locked. Stevenson was not assigned to the murder investigation and was not instructed to take a statement from Jones or to ask him any questions. State v. Jones, 281 Conn. at 650-51 & n.30.

Because Jones had arrived at lunchtime, Stevenson stated that he asked Jones

if he was hungry. When Jones said he was, Stevenson ordered food for them both. While they ate, the men engaged in casual conversation about, inter alia, Jones' children and religion. They had a good rapport and were on a first name basis. Stevenson noted nothing in Jones' behavior or demeanor that would indicate that he was under the influence of drugs or alcohol. Neither man discussed the murder during the ninety minutes it took for the food to arrive and for them to eat. Shortly thereafter, Jones spontaneously indicated that he had not killed anyone. Stevenson ignored the comment. Then Jones stated that he knew that the police thought it was about the girl. When Stevenson asked Jones if he knew Williams, Jones stated that Williams did not deserve what Jones had done to him. At that time, Stevenson excused himself, left the room and told his supervisor, Detective Lieutenant O'Leary ("O'Leary"), what Jones had said. When O'Leary learned that Jones had not been read his rights, he instructed Stevenson to do so and then ask Jones if he would speak to Stevenson about the murder. Id. at 651-52.

Stevenson said that he returned to the interview room with an advice of rights card and read Jones his rights. After Jones stated that he understood his rights, he signed and dated the advice of rights card. Jones then gave Stevenson a detailed oral confession of how he shot and killed Williams. Senior Detective John Kennelly was present throughout the confession. After they finished talking, Stevenson told Jones that he wanted to reduce the oral confession to a written statement. Jones did not object. Before he began typing, Stevenson asked Jones to read a voluntary statement rights form and to initial each line. Jones complied. Stevenson then typed the confession while Jones, sitting next to Stevenson, looked on. When Stevenson

completed the statement, he asked Jones to read the statement. When Jones finished reading the statement, he signed and initialed it. Id. at 652.

Stevenson testified that, during the confession, Jones stated that he had disassembled the gun and thrown the pieces into the woods behind a housing project in Waterbury. Several hours later, while Jones was being escorted to the booking area, he spontaneously told Stevenson to find Jones' brother Martin in Hartford, and he would find the gun. The next morning, Stevenson located Martin in Hartford. When Martin denied knowledge of the gun, Stevenson arranged for Martin to speak to Jones by phone. After the conversation, Martin led Stevenson to the murder weapon, hidden behind an abandoned house in Hartford. Id. at 652-53.

Jones' testimony differed markedly from Stevenson's testimony. Jones stated that when he was arrested he was intoxicated because he had just returned home from a night of heavy drinking and drug use. He stated that Stevenson and O'Leary began questioning him about the murder as soon as he arrived at the Waterbury Police Department and that he was never advised of his rights. Jones also stated that his request to speak to an attorney was ignored. Jones said that he signed the written confession because he was led to believe that the statement would be helpful to him, but had not read it. He denied that the signature on the advice of rights form was his and claimed that, although the signature on the voluntary rights form was his, he probably had signed it on a different day in connection with a different investigation. Id. at 653.

The trial court found Stevenson credible and Jones not credible to the extent that his testimony differed from Stevenson's testimony. The court concluded that the

confession was given knowingly and voluntarily after Jones was fully advised of his rights and denied the motion to suppress the confession. The court also concluded that the statement about the gun was given voluntarily, after Jones had been advised of his rights, and denied the motion to suppress the murder weapon. Id. at 653-54.

The Fifth and Fourteenth Amendments required that, prior to a custodial interrogation, the criminal defendant must be informed that (1) he has a right to remain silent, (2) anything he says can be used against him in a court of law, (3) he has a right to an attorney, and (4) if he cannot afford an attorney, one will be provided for him prior to any questioning. Miranda v. Arizona, 384 U.S. 436, 444 (1966).

A waiver of these rights is made knowingly if the criminal defendant is aware "of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). To determine whether a criminal defendant has voluntarily waived his rights, the court must look to the totality of the circumstances surrounding the confession. Arizona v. Fulminante, 499 U.S. 279, 282-89 (1991). These circumstances include the criminal defendant's background and prior experience with law enforcement, the conditions of the interrogation, and the conduct of the law enforcement officers. See United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995). The same analysis applies under the Due Process Clause of the Fourteenth Amendment. See Dickerson v. United States, 530 U.S. 428, 434 (2000) (holding that the test for whether a confession is voluntary or coerced under the Due Process Clause considers the totality of the circumstances surrounding the confession, including both the mental and physical state of the accused and the details of the interrogation).

In reviewing this claim, the Connecticut Supreme Court correctly identified Miranda as establishing Jones' rights. The court considered the totality of the circumstances to determine whether the waiver was voluntary and knowing and examined the record to ensure that the trial court's findings were supported by the record. State v. Jones, 281 Conn. at 654-55. Because the Connecticut Supreme Court applied the correct legal principles, the decision is not contrary to clearly established federal law. This court must consider, therefore, whether the state court's analysis is an unreasonable application of that law.

The Connecticut Supreme Court acknowledged that Jones' claim that he was not afforded his Miranda rights was based on the trial court's credibility assessment of the testimony at the suppression hearing. Jones had conceded that, if the state's version of the events were credited, it would be sufficient to establish that Jones had made a knowing and voluntary confession. See Miranda, 384 U.S. at 444. The Connecticut Supreme Court then carefully examined the record to ensure that the trial court's findings were supported by substantial evidence. State v. Jones, 281 Conn. at 654-55.

The record revealed that Jones had twelve prior arrests and had been appointed counsel at least once. Thus, the court determined that Jones was familiar with his rights. Jones was not treated harshly at the police station and was not held for an excessive period of time. He was provided food and drink and allowed to use the restroom. The conversations with Stevenson were cordial, not intense. Jones was at the police station at most two hours before he was questioned. After the oral questioning, Jones did not object to his statements being written, and he signed the voluntary rights form. The questioning lasted only several hours. See, e.g., Tobias v.

11

Portuondo, 367 F. Supp. 2d 384, 394-95 (W.D.N.Y. 2004) (noting that statement given eight hours after prisoner advised of rights was within reasonable time of Miranda warning, and that no Supreme Court precedent requires new warnings where person in continuous custody and time lapsed was reasonable); Holland v. Donnelly, 216 F. Supp. 2d 227, 233-37 (S.D.N.Y. 2002) (holding not an unreasonable application of Supreme Court precedent a state court determination that confession was voluntary where it was obtained after accused was in custody for nineteen hours where questioning was cordial and intermittent and accused afforded food, access to the restroom, and opportunity to sleep).

Absent any evidence or observations suggesting intoxication, the trial court rejected Jones' claim that he was highly intoxicated at the time. Based on Stevenson's testimony and the documents signed by Jones, the trial court concluded that Jones knowingly and voluntarily waived his rights before he confessed to the murder. In addition, the record contains no evidence suggesting that Jones' later statements about the location of the murder weapon were in response to police questioning. Rather, the statements were spontaneous. Finally, the state court noted that the prosecution did not attempt to introduce Jones' statements given before he was advised of his rights. The Connecticut Supreme Court decided that these determinations were reasonable.

State court findings regarding subsidiary issues, such as the length and circumstances of an interrogation, are entitled to a presumption of correctness. See Miller v. Fenton, 474 U.S. 104, 112 (1985). Jones must rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). He has not done so. The record indicates that the state court considered the totality of the circumstances in evaluating

this claim, including Jones' background and prior experience with law enforcement, as well as his physical and mental health, the conditions of the interrogation, and the conduct of the police officers.  This court concludes that the Connecticut Supreme Court's determination that the trial court properly found that Jones was notified of his Miranda rights before giving his statement was a reasonable application of Supreme Court law.[1]

B.     Presence at Trial

Jones next argues that he was denied his Sixth and Fourteenth Amendment right to be present at all critical stages of his prosecution when he was removed from the courtroom.  He contends that the trial court failed to warn him that his disruptive conduct could result in his removal before ordering the marshals to remove him and that the trial court improperly refused to permit him to return despite his request and willingness to conduct himself appropriately.

The Connecticut Supreme Court determined that the following additional facts were relevant to this claim.  Throughout the pretrial proceedings, Jones was dissatisfied with his representation and repeatedly asked to have McWhirter removed.  Although he was represented, Jones filed many pro se motions and, despite defense counsel's presence, argued points of law with the court.  Even after the court ruled on an issue, Jones attempted to reargue the issue if he did not agree with the result.  State v. Jones, 281 Conn. at 619-20.

---

[1] Jones also argued that the police had confronted him with inculpatory statements allegedly made by Byrd.  The trial court rejected this assertion.  However, even if the police had made the statements, these representations would not undermine the voluntariness of Jones' confession.  See Frazier v. Cupp, 394 U.S. 731, 739 (1969) (holding that police use of false statement that co-conspirator had confessed was insufficient to render otherwise voluntary confession inadmissible).

One of Jones' many motions was a motion for speedy trial. When the court informed Jones at a hearing that it would not recognize his pro se motion because he was represented by counsel, Jones complained that the court was "throwing [him] to the wolves" and sought to dismiss McWhirter. Jones asked whether the state would offer a plea deal. When McWhirter responded that Jones had rejected the state's offer of thirty-eight years, Jones claimed that the offer was not genuine because it was communicated to him by McWhirter and not directly by the judge or prosecutor. At that point, the prosecution offered forty-five years. Jones became irate and needed to be restrained. The court cautioned Jones to calm down or he might face a contempt charge. Shortly thereafter, Jones filed a grievance against McWhirter. The court allowed Jones to dismiss McWhirter and appointed Hopkins to represent Jones. Id. at 620-23.

After the court denied Jones' motion to suppress and the attorneys had agreed that there were no further matters for the court to address prior to trial, Jones was unwilling to accept the ruling. He challenged the court's findings of fact and conclusions of law. After some discussion, the court informed Jones that the matter had been decided and his rights had not been violated. Jones refused to accept the decision. En route back to prison, Jones put his fist through a plexiglass window in the transport van. Id. at 623-24.

On the first day of trial, the state called Minnifield as a witness. Minnifield testified that Jones became angry at seeing her in a new outfit and had cut her with a knife. Outside the presence of the jury, the court admonished the prosecutor for eliciting that information from Minnifield in violation of a pretrial order precluding

14

evidence that Jones had cut Minnifield with a knife. Attorney Hopkins explained that he had not objected to the testimony because he did not want to focus the attention of the jury on that testimony and asked the court for a cautionary instruction. The court instructed the jury that they should disregard testimony about the assault on Minnifield because Jones was not on trial for that charge. Id. at 624.

On the second day of trial, Hopkins informed the court that Jones wished to move for a mistrial as a result of Minnifield's testimony. The court noted that the issue involved a legal question, and the court would only consider the matter if Hopkins wished to revisit the issue. Hopkins declined. Jones then informed the court that he wanted nothing further to do with the trial. When questioned by the court, Jones stated that he knew what he was doing and wanted to absent himself from the proceeding. Jones told the court that he understood that the trial would continue and he might be prejudiced because the jury would note his absence. Jones also stated that he intended to dismiss his attorney and represent himself. The court denied the request and ordered the marshals to remove Jones from the courtroom. Jones did not leave willingly and a scuffle ensued with between eight and ten marshals. Id. at 625-30.

After he was removed, Attorney Hopkins asked for time to enable Jones to calm down and consider whether he wished to absent himself. The court granted this request, but expressed skepticism whether Jones would be permitted back into the courtroom in light of his violent outbursts and his refusal to listen to or be bound by court rulings. The chief marshal for the judicial district asked the court to consider full restraints if Jones were allowed back in the courtroom. After hearing from counsel, the court agreed that each morning, Jones would be offered the opportunity to come to

15

court, but would not be forced to attend if he declined.   If he came, Jones could attend the proceedings in full restraints or watch the proceedings from an adjoining holding cell equipped with a monitor and speaker system.   Id. at 630-33.

The morning of the third day of trial, Jones came to court and stated that he wanted to be present in the courtroom.  He did not agree to wear full restraints.  After speaking with Jones, the deputy chief marshal stated that Jones agreed to wear full restraints and promised no further outbursts.  The chief deputy marshal opined that his personnel could maintain adequate security in the courtroom under these conditions, and the court agreed to permit Jones to be present.  When the marshals went to get Jones, he was visibly agitated, confrontational, and talking about what had happened the day before.  The chief deputy marshal stated that he thought there would be trouble if Jones were brought into the courtroom.  The court reconsidered its decision and ruled that, by his disruptive behavior, Jones had waived his right to be present during the proceedings.  Jones refused to observe the proceedings from the holding cell and asked to return to prison.  He did not return to the courtroom until his sentencing.  The court instructed the jury that Jones was absent with the permission of the court, and they could draw no adverse inference from his absence.  Id. at 633-36.

A criminal defendant has a constitutional right to be present at all critical stages of his prosecution.  Rushen v. Spain, 464 U.S. 114, 117 (1983).  The right to be present, however, is not absolute.  See Illinois v. Allen, 397 U.S. 337, 342 (1970) (declining to hold that a trial judge could never remove a criminal defendant from the courtroom).  A criminal defendant may lose his right to be present by his conduct or with his consent.  See Snyder v. Massachusetts, 291 U.S. 97, 106 (1934); see also Taylor v.

16

United States, 414 U.S. 17 (1973) (holding that unincarcerated criminal defendant's voluntary absence from courtroom does not prevent trial from continuing); Gilchrist v. O'Keefe, 260 F.3d 87, 97 (2d Cir. 2001) ("[A] defendant may be found to have forfeited certain trial-related constitutional rights based on certain types of misconduct.").

In reviewing a case where the criminal defendant engaged in abusive and disrespectful argument with the court, threw papers on the floor, and tore his attorney's file, the Supreme Court held that a criminal defendant "can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." Allen, 397 U.S. at 343. Trial courts have discretion to tailor the remedy to the circumstances of the case. For example, the court could order the criminal defendant bound and gagged while remaining in the courtroom, cite him for contempt, or remove him from the courtroom until he promises to behave properly. Id. at 343-44.

In analyzing this claim, the Connecticut Supreme Court cited the relevant Supreme Court law regarding the right to be present at trial and the ways that a criminal defendant may waive that right. See State v. Jones, 281 Conn. at 636-37 (citing Taylor, 414 U.S. 17; Allen, 397 U.S. 337; Snyder, 291 U.S. 97). Thus, the state court decision is not contrary to Supreme Court law.

Regarding Jones' claim that the trial court failed to warn him that his disruptive behavior could result in removal, the Connecticut Supreme Court noted that no warning was required because Jones requested to leave the courtroom. The record clearly

demonstrated that Jones repeatedly informed the court that he no longer wished to participate in his trial or be brought to court, assured the court that he understood that the trial would continue in his absence, and stated that he was certain of his decision. Despite these statements, the trial court explained that the trial would continue and that he might be prejudiced by his absence.  Id. at 638.  Jones never stated that he had changed his mind and decided to remain in the courtroom.

A criminal defendant's waiver of his right to be present at trial may be express or implied from his conduct.  For example, if a prisoner refuses to leave his cell to attend trial, he has voluntarily waived his right to attend trial.  See Wilson v. Harris, 595 F.2d 101, 103 (2d Cir. 1979) (denying petition for writ of habeas corpus where petitioner knew trial was to commence but refused to go to court); see also Byas v. Keane, No. CIV. 2789, 1999 WL 608787, at *12-13 (S.D.N.Y. Aug. 12, 1999) (petitioner who specifically requested not to attend court proceedings voluntarily waived right to be present; in addition, disruptive conduct constituted waiver of right to be present).

 The record clearly reflects that Jones' removal was precipitated by his request to leave, and Jones has presented no contrary evidence.  The court concludes that the Connecticut Supreme Court's analysis of this claim is not an unreasonable application of Supreme Court law.

In the second part of this claim, Jones argues that the trial court should have permitted him to return to the courtroom once he promised to behave appropriately and should not have relied on the assessment of the deputy chief marshal regarding his demeanor.

The Connecticut Supreme Court noted that the trial judge initially agreed to

permit Jones back in the courtroom based on his agreement to wear full restraints and promise to behave appropriately.  The deputy chief marshal reported that Jones was behaving confrontationally with the marshals, was agitated, and was not apologetic about his behavior the day before.  The deputy chief marshal opined that Jones wished to return to the courtroom to disrupt the proceedings.  As a result, the court concluded that, based on Jones' prior violent outbursts and his inability to control himself whenever the court ruled against him, as well as his lack of desire to control his behavior, his presence in the courtroom would endanger all other persons in the courtroom and disrupt the proceedings.  State v. Jones, 281 Conn. at 641-42.  Although Jones was given the option of listening to the proceedings from a holding cell, enabling him to consult with counsel during the remainder of the trial, Jones chose to return to prison.

The Connecticut Supreme Court evaluated the trial court's actions in light of the three options identified in Allen.  The court acknowledged that the preferred course is to permit a criminal defendant to return to the courtroom on a promise of appropriate behavior, but noted that the trial court's concern for the safety of persons in the courtroom was well-founded.  Jones had broken his hand in a violent outburst in response to an adverse ruling a few days earlier, had to be restrained in court before, and, the previous day, had to be escorted from the courtroom by between eight and ten marshals.  The struggle to remove Jones from the courtroom resulted in one marshal being hospitalized.  Jones had threatened further harm to the marshals, raising a question of harm to the marshals while escorting him to and from the courtroom.  Jones was unwilling to accept any adverse ruling and displayed no contrition for his behavior.

19

Additionally, the trial court questioned whether having Jones in the courtroom in full restraints would prejudice him in the eyes of the jury.  Id. at 643-44.  This court concludes that the Connecticut Supreme Court's analysis of the claim was neither contrary to nor an unreasonable application of established Supreme Court law.  See Norde v. Keane, 294 F.3d 401, 413 (2d Cir. 2002) (holding that trial judge's removal of prisoner from courtroom was within his discretion where prisoner verbally disrupted proceedings).

Further, although Jones challenges the trial court's incorporation of the deputy chief marshal's assessment of his demeanor, Jones provides no Supreme Court law prohibiting the trial court from taking the marshal's opinion into consideration.  See United States v. Samuel, 431 F.2d 610, 615 (4th Cir. 1970) (noting that, although responsibility for courtroom security rests with the judge, "he may rely heavily on the Marshal's advice as to what may be required since it is the Marshal who has the experience in the keeping of prisoners and who must provide the guards and bear the major responsibility if untoward incidents occur"); accord Deck v. Missouri, 544 U.S. 622, 634-35 (2005) (discussing factors trial court must consider when exercising discretion to require prisoner to wear restraints in the jury's presence).  Here, the trial judge was already skeptical of Jones' ability to behave appropriately if he were permitted to return to the courtroom.  The record reflects that the trial court considered and heavily relied on the deputy chief marshal's advice, not that the trial court permitted the marshal to make the final decision.  Accordingly, relief is denied on this ground.

C.    Self-Representation

Finally, Jones argues that the court denied his Sixth Amendment right when the

trial court denied his request to dismiss Hopkins and represent himself.

Criminal defendants have a right to self-representation.  See Faretta v. California, 422 U.S. 806, 836 (1975).  The court, however, may terminate this right if the criminal defendant "deliberately engages in serious and obstructionist misconduct."  Id. at 834 n.46.  One circuit court, applying the rationale of Allen, held that a criminal defendant may waive his right to self-representation by the same conduct that waives his right to be present at trial.  See United States v. Dougherty, 473 F.2d 1113, 1125 (D.C. Cir. 1972).

In analyzing this claim, the Connecticut Supreme Court applied the holdings from Faretta and Allen.  Thus, the state decision is not contrary to applicable Supreme Court law.  The Connecticut Supreme Court relied on its determination that Jones had forfeited his right to be present in the courtroom by his disruptive conduct to conclude that Jones also forfeited any right to self-representation by that same conduct.  As discussed above, the state court reasonably applied Supreme Court law in assessing Jones disruptive behavior.  The conclusion, based on that analysis, that Jones also had forfeited his right to self-representation, is not an unreasonable application of Supreme Court law.

VI.    CONCLUSION

The Petition for Writ of Habeas Corpus (Doc. No. 3) is denied.  The Clerk is directed to enter judgment in favor of the respondent and close this case.

The court concludes that petitioner has not shown that he was denied a constitutionally or federally protected right.  Thus, any appeal from this Order would not be taken in good faith, and a certificate of appealability will not issue.

21

**SO ORDERED**

Dated at Bridgeport, Connecticut this 20th day of September, 2010.

　　　　　　　　　　　　　　　　 /s/ Janet C. Hall　　　　　　
　　　　　　　　　　　　　　　　Janet C. Hall
　　　　　　　　　　　　　　　　United States District Judge